*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CHAD MICHAEL WHITE,

Defendant-Appellant.

UNPUBLISHED
July 10, 2026
1:31 PM

No. 372127
Kalamazoo Circuit Court
LC No. 2020-002465-FC

Before: ACKERMAN, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

Defendant Chad White stands convicted of the first-degree murder of Amber Walker. On appeal, he challenges the sufficiency of the evidence against him and the effectiveness of the representation he received in the trial court.[1] We discern no errors in the trial court proceedings, so we affirm defendant's conviction.

## I. FACTS

Around midday on December 14, 2020, the body of Amber Walker was discovered lying in the shallows of a lake near Augusta by a gravel boat launch. Later analysis concluded that she had suffered several gunshot wounds and extensive blunt-force trauma, consistent with having been run over by a car. The Kalamazoo County Sheriff's Office responded to the crime scene. There, officers found bloodstains that showed "feathering," a smear pattern that signified that a bloody object had been dragged across the ground; subsequent testing showed that the blood matched Walker's. Officers also found a McDonald's receipt documenting a $4.22 purchase, at 1:46 a.m., of Chicken McNuggets and a large Coca-Cola, with $50 tendered and $45.78 returned

---

[1] Defendant has filed both a brief prepared by counsel and a pro per brief under Standard 4 of the Minimum Standards for Indigent Criminal Appellate Defense Services. See Administrative Order No. 2004-6, 471 Mich c, cii (2004).

in change; they also found $45 in cash on the ground. Police further located two fired cartridge casings.

Police later received a tip that defendant may have been the murderer. Deputies followed up on that tip by visiting the Galesburg home of Kayla Farrow, where they also met with her father, Kevin Farrow. There, Kayla reported that she had recently begun dating defendant. She said that on the evening of December 13, defendant "asked if [Walker] could come smoke with us," and Kayla refused because she did not want that around her children, so defendant left with Walker.

The following day, defendant spoke with both Kayla and Kevin. According to Kevin, defendant asked him to go for a drive, so they left in a white vehicle. While driving, defendant related "that he had caught a body," which Kevin interpreted as meaning that defendant had killed someone. Defendant said that he was taking Kevin "to where it happened." On the way, defendant said that "there was a place on the side of the road, on the right hand side where there was a house up like on a hill," and "that [defendant] had thought about doing it at that lot, but because of the house he didn't." Defendant took Kevin to a "parking area" next to a lake—the boat launch where Walker's body was found—and told Kevin "that he had killed a girl and he said that she had been shot in the face three times and ran over a few." Kevin also said that defendant asked "if you can get fingerprints after the body has been in water." Afterward, defendant returned Kevin to Galesburg.

Defendant also went for a drive with Kayla. When she got up on December 14, she said that defendant was "getting ready for the day" because "he was going to his brother's to go get shoes." He gave her clothing that he said he had gotten for her, but she "just threw it in the closet." She asked if defendant would take her with him, and he agreed, taking her and her two young children in a white vehicle. Kayla observed that during the drive, defendant acted "[k]ind of like rushy, like panicking and stuff." When they got to their destination, Kayla waited in the vehicle while defendant went inside. While waiting, her two-year-old wriggled out of his car seat, which caused her to look in the back seat. There, she saw "blood on the back of the door," which left her "freaked out," although she did not say anything. While subsequently driving around, defendant told Kayla "that he caught a body and he said that it was a female"—which she also interpreted to mean that he had killed someone—and asked if Kayla "wanted to go see it." She declined, and defendant returned her to her home. After defendant left, she took a closer look at the clothing he had given her that morning and saw that it had blood on it. That led her to call the police.

Using cell phone tower triangulation, police later found a white vehicle matching the Farrows' description parked outside an apartment in Plainwell. Police determined from other residents that defendant was inside, and he ultimately surrendered and was taken into custody. He was wearing "a large gold watch." A subsequent search of the apartment turned up a firearm, the owner's manual for a Nissan Sentra—the white vehicle in the parking lot—and, in a trash can, a key fob that activated the Sentra. The vehicle was missing its passenger-side mirror. The side portion of the vehicle had been spray-painted black in amateurish fashion. Further investigation revealed that Hayden Hayes, a teenager who knew defendant, had been approached by defendant at some point on December 14, and the two went to a Dollar General, where Hayes stole a can of black spray paint and began painting the rear of the vehicle black at defendant's direction. The back seat of the vehicle contained additional bloodstains that matched Walker's, a McDonald's

bag with part of a Chicken McNugget in it, and a fired cartridge casing; the cupholders contained about half an inch of "brownish colored liquid," which turned out to be Coca-Cola.

The day after defendant's arrest, police visited the McDonald's listed on the receipt. Drawing on the timestamp on the receipt, they obtained security footage showing Walker driving up in a similar white vehicle that was also missing its passenger-side mirror. An unidentified individual was sitting next to Walker, wearing a large, shiny watch.

Defendant was charged with open murder under MCL 767.71 and felony-firearm, MCL 750.227b(1). After the preliminary examination, he was bound over to circuit court for trial. In addition to testimony about the apparent narrative of the offense, the prosecution introduced significant forensic science evidence. The prosecution's medical examiner, Dr. Theodore Brown, opined that Walker's cause of death was "multiple injuries" that included "gun shot wounds and blunt force injuries," and that her manner of death was "homicide." An expert opined that a bullet found in Walker's body had been fired from the gun found in the apartment where defendant was arrested. DNA evidence on that gun linked it to defendant, as did DNA evidence on a pair of sandals found at the crime scene. Blood was found on the tires and wheel spokes of the Sentra, along with an unusual amount of dirt forced up into the plastic protection underneath the car. A review of recovered cell phones indicated communication between defendant and Walker, with some suggestion of a proposed sexual encounter, and showed that around 4 a.m., defendant had performed Internet searches for topics like "[w]hen you kill somebody and throw they body in water, do fingerprints show up."

The jury found defendant guilty of both first-degree murder and felony-firearm. He was given the mandatory sentence of life without parole for first-degree murder, MCL 750.316(1), consecutive to a mandatory two-year sentence for felony-firearm, MCL 750.227b(1), (3). This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant, both through counsel and in his Standard 4 brief, challenges whether there was sufficient evidence to convict him of first-degree murder. "[W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992).

To analyze a sufficiency challenge, we must therefore begin by identifying the elements of the offense. Here, defendant challenges his conviction of first-degree murder. "The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Woods*, 416 Mich 581, 599 n 2; 331 NW2d 707 (1982) (citation omitted).

Here, there is overwhelming evidence that defendant killed Walker through some combination of shooting her and running her over with the white vehicle. Someone wearing a large watch similar to the one defendant was wearing when he was arrested was seen with Walker

at a McDonald's shortly before she died, riding in a vehicle similar to the one found outside the apartment where defendant was arrested. That vehicle had Walker's blood in it; it also had the remains of a McDonald's meal consistent with what Walker purchased shortly before her death, and an amount of cash consistent with the change reported on the McDonald's receipt was found at the crime scene. Ballistics analysis concluded that the bullet found in her body was fired by the gun recovered from the apartment where defendant was arrested, and DNA evidence linked him to that weapon. Two witnesses testified that defendant had told them that he had "caught a body," which they both understood to mean that he had killed someone. Defendant performed Internet searches about whether fingerprints would remain on a body left in water, and he took steps to paint the vehicle black, presumably to cover up the blood spatters on it. Defendant's argument that there is insufficient evidence to prove his identity as Walker's killer is unpersuasive.

That said, to convict defendant of first-degree murder, there also needed to be evidence that the killing was intentional and committed with premeditation and deliberation. Here, too, we conclude that a rational trier of fact could have found that these essential elements were proven beyond a reasonable doubt. Most importantly, Kevin Farrow's testimony that defendant said he "had thought about doing it" at one location but decided against it because there was a house there, and instead killed Walker at the more secluded boat launch, strongly supports the jury's finding that defendant killed Walker intentionally, with premeditation and deliberation. Defendant's sufficiency challenge is unpersuasive.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also challenges the effectiveness of the counsel he received in the trial court. In general, a defendant preserves a claim of ineffective assistance of counsel by filing a motion in this Court seeking to remand the matter to the trial court for a hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Defendant filed such a motion in this Court under MCR 7.211(C)(1), but it was denied, so "our review is for errors apparent on the record." *Id*. To succeed on such a claim, the defendant must show "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). In this context, "prejudice" means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," while "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (citation omitted). "[D]efendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

In his brief filed by counsel, defendant asserts that it was prejudicial for his attorney not to object when Dr. Brown, the prosecution's forensic pathologist, was asked to opine on the manner of death and answered "homicide." We disagree. This Court has squarely held that "it is not beyond a forensic pathologist's area of expertise to offer testimony in the courts of this state concerning both the cause of death and the manner of death." *People v Unger*, 278 Mich App 210, 252; 749 NW2d 272 (2008). This testimony was admissible under *Unger*, so any objection would have been futile.

Defendant raises several more arguments in his Standard 4 brief. He first argues that his attorney's decision not to cross-examine many prosecution witnesses constituted ineffective

-4-

assistance. We disagree. His trial counsel elected to focus on a lack of proof that defendant had any demonstrated motive to kill Walker and argued that the prosecution had failed to prove premeditation or deliberation. Cross-examining the prosecution's scientific experts would not have furthered this strategy. Indeed, defendant proposes that the scientific experts should have been asked whether they witnessed the killing or had any independent knowledge of defendant's state of mind. Because there was no intimation that the scientific experts who conducted the forensic testing of evidence recovered at the crime scene purported to have seen either the killing or defendant at the scene or could speak to defendant's state of mind, it is difficult to imagine how asking these questions could have made any difference to the jury. At minimum, in light of the presumption of sound trial strategy, we conclude that this argument has no merit.

Defendant also claims that his trial attorney erred in pursuing an "all-or-nothing" defense strategy. Strictly speaking, this is not true, as the jury was instructed on second-degree murder, so defendant is wrong to argue that the jury was instructed only on first-degree murder. It *is* true that defense counsel focused on developing potential holes in the prosecution's evidence regarding premeditation and less so on the other elements of the offense, and that he did not seek an instruction on voluntary manslaughter. In light of the overwhelming evidence that defendant committed at least second-degree murder, defendant's criticism of his attorney's focus on the lack of evidence for premeditation does not overcome the presumption of sound trial strategy. Moreover, the only specific prejudice defendant identifies is that he would not have testified on his own behalf had he known of other lesser-included options. We do not see how his brief testimony, in which he flatly and—in the eyes of the jury—implausibly denied killing Walker, had any effect on the outcome of this case. Further, the jury's decision to reject the option of second-degree murder significantly undermines any argument that it would have chosen voluntary manslaughter.

Defendant next alleges that his trial counsel was ineffective for failing to seek the appointment of an expert to help develop criticisms of the prosecution's scientific experts' testimony. While defendants are sometimes entitled to the assistance of a court-appointed scientific expert to help prepare a defense, "the defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert; otherwise, every defendant would receive funds for experts upon request." *People v Kennedy*, 502 Mich 206, 226; 917 NW2d 355 (2018). As a result, "a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id*. at 228.

Cases in which counsel's failure to obtain such assistance has amounted to ineffective assistance look quite different. In *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), defense counsel failed to obtain an expert to assist with rebutting the prosecution's shaken-baby syndrome testimony. His failure to do so constituted ineffective assistance "[g]iven the centrality of expert testimony to the prosecution's proofs and the highly contested nature of the underlying medical issue." *Id*. at 393-394. This establishes two relevant analytic prongs: centrality and contestation. In *Ackley*, the attorney's failure to obtain expert assistance was ineffective "in light of the prominent controversy within the medical community regarding the reliability of [shaken-baby syndrome] diagnoses." *Id*. at 391-392.

Defendant cannot satisfy the *Kennedy* standard. He identifies no controversy regarding the scientific evidence at issue in this case akin to that in *Ackley*. Even more importantly, we do not see how the testimony was particularly central to the prosecution's case. Given that Walker's body was found at the boat launch, whether her blood matched that found on the ground was of limited significance; and, given that she had just been seen in the vehicle buying food shortly before she was killed, one would also expect that it was her blood found in that vehicle. Similarly, regardless of any DNA evidence linking defendant to the gun, it was found in the apartment where he was arrested. For the same reason that it was not ineffective for defense counsel to choose not to cross-examine these witnesses, it was also not ineffective to forgo consulting scientific rebuttal experts: this evidence simply was not central to the prosecution's case in light of the significant circumstantial evidence linking defendant to the crime.

Finally, defendant argues that the cumulative effect of these errors denied him a fair trial. "It is true that the cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not." *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002). However, that means there must *be* an error. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). Defendant has identified no errors in his attorney's representation, so there can be no cumulative error.

## IV. BIND-OVER

Finally, defendant challenges the district court's decision to bind this matter over to the circuit court for trial, as well as the effectiveness of his trial counsel's representation at the preliminary examination. When a case is bound over to circuit court and the defendant is found guilty, "any subsequent appeal [does] not consider whether the evidence adduced at the preliminary examination was sufficient to warrant a bindover." *People v Yost*, 468 Mich 122, 124 n 2; 659 NW2d 604 (2003). As a result, defendant cannot challenge whether he should have been bound over.

Even if couching this argument as a critique of his attorney's performance would allow him to overcome this barrier, we still would not grant relief. It is true that, at the conclusion of the preliminary examination, defense counsel simply said that he would "leave it to the Court's discretion" whether to bind the case over for trial; defendant believes this was insufficiently zealous representation. But under *People v Coddington*, 188 Mich App 584, 593-594; 470 NW2d 478 (1991), "the elements of premeditation and deliberation are not required elements for which evidence must be presented at a preliminary examination in order to bind a defendant over for trial on open murder charges." In light of the overwhelming evidence that defendant at least committed second-degree murder, his attorney can hardly be faulted for this response. Moreover, the prosecution introduced evidence at the preliminary examination that specifically substantiated the elements unique to first-degree murder: Kevin Farrow also testified in those proceedings that defendant had identified a place "where he had thought about doing it" but then said it "was too . . . there was a house and stuff." In other words, even if premeditation and deliberation *did* need to be substantiated at a preliminary examination, the prosecution would have satisfied that burden.

Defendant has identified no issues of merit.  His convictions are therefore affirmed.

/s/ Matthew S. Ackerman
/s/ James Robert Redford
/s/ Kathleen A. Feeney